IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVELYN S. HARRIS,
          Plaintiff,

                                      CV 06-1226-PK

                                      FINDINGS AND
v.                                     RECOMMENDATION

THE STANDARD INSURANCE COMPANY and
McNEES, WALLACE & NURICK WELFARE
BENEFIT PLAN,
          Defendants.
_____

PAPAK, Magistrate Judge:

      This action was filed against defendants The Standard Insurance Company ("Standard")

and McNees, Wallace & Nurick Welfare Benefit Plan (the "Plan") by plaintiff Evelyn S. Harris

on May 16, 2007.  Harris' complaint alleges improper denial of benefits and breach of fiduciary

duty in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), and

requests both monetary damages and equitable relief.  This court has federal question jurisdiction

Page 1 - FINDINGS AND RECOMMENDATION

over Harris' action pursuant to 28 U.S.C. § 1331, *see* 29 U.S.C. § 1132(a)(1)(B).

Now before the court are defendants' motion to strike (#62) extra-record evidence submitted by Harris in connection with the parties' cross-motions for summary judgment, defendants' motion for summary judgment (#44), and Harris' motion for summary judgment (#55). This court has considered the parties' motions, the pleadings on file, and oral argument on behalf of both parties. For the reasons set forth below, this court grants the motion to strike, recommends that defendants' motion for summary judgment be granted, and recommends that Harris' motion for summary judgment be denied.

## LEGAL STANDARDS

### I.    Motion to Strike

The disposition of a motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wind Distribs. Pty., Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), abrogated on other grounds by *Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

### II.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the

nonmoving party, and may neither make credibility determinations nor perform any weighing of

the evidence.  *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

Harris was employed as an attorney at the Pennsylvania-based law firm McNees Wallace

& Nurick from March 1, 2001, to July 31, 2002.  While employed at McNees Wallace, she was a

covered participant in the Plan, which provided long-term disability ("LTD") benefits pursuant

to a group LTD policy (the "Policy") issued by Standard, which also functions as the Plan's

administrator.

The Policy defined being disabled from one's own occupation, in relevant part, as

follows:

> You are Disabled from your Own Occupation if, as a result of Physical Disease,
> Injury, Pregnancy or Mental Disorder:
>
> 1.    You are unable to perform with reasonable continuity the Material Duties
>       of your Own Occupation; and
>
> 2.    You suffer a loss of at least 20% in your indexed Predisability Earnings
>       when working in your Own Occupation.

A.R. 090.[1]  As an attorney, Harris was entitled under the Plan to LTD benefits for any period

during which she was disabled from her own occupation, until she reached age 65, provided that

---

[1]  Citations to the administrative record will use the designation "A.R." followed by the
three digit Bates number corresponding to the referenced page of the record.

she became disabled while covered under the Policy and that she remained continuously disabled

for a period of 180 days (the "Benefits Waiting Period") following the onset of disability and

prior to receiving LTD benefits.[2]  *See* A.R. 095-094, 074.

On October 24, 2001, Harris began consulting a general practice physician, Megan

Borror, in connection with moodiness and irritability problems that Harris reported as possibly

related to perimenopause.  *See* A.R. 327-328.  Harris did not report pain symptoms during this

visit, but did report fatigue symptoms in connection with the monthly onset of menses; she

specified that she had been subject to such menstrual symptoms "always as far back as she can

remember."  *Id.*  Dr. Borror prescribed FemHRT (a continuous combined hormone replacement

therapy) to treat Harris' symptoms.  *See id.*

At a follow-up appointment on December 10, 2001, Harris reported that all of her

reported symptoms, plus depression, were now under control.  *See* A.R. 328.  Four days later,

however, Harris called Borror's office reporting intermittent episodes of depression symptoms,

for which she was prescribed Effexor.  *See* A.R. 329.  On December 18, 2001, Harris again

visited Borror's office, and reported that her depression symptoms were improved.  *See id.*

According to Borror's notes:

> [Harris] is able to concentrate on work, no longer having significant mood
> swings, irritability.  She had difficulty at work w/ noticing she would look at work
> load she had and get physically sick to her stomach, and feel energy drain.  This is

---

[2]  The Policy provided that the Benefits Waiting Period could be interrupted by a period of up to 30 days during which a claimant could temporarily recover from a disabling condition without losing his or her entitlement to LTD benefits or needing to begin a new Benefits Waiting Period, *see* A.R. 087-086, but the applicability of the temporary recovery provision was not raised in the briefs of either party in support of the summary judgment motions now before the court.  This court therefore will not consider the affect, if any, of the temporary recovery provision in analyzing the parties' motions.

> no longer happening.  She gets thru work day fine, libido improved.  Appetite
> fine.

*Id.*  On February 28, 2002, Harris again reported to Borror that "things were better, [and that she]

no longer ha[d] significant mood swings or irritability."  *See* A.R. 330.  However, on May 22,

2002, Harris reported to Borror that for the three previous weeks she had again experienced

problems with "decreased energy, [and a] sense of being tired, [of] not having energy to get out

of [her] chair.  Low ambition, no drive.  Feels empty and hollow inside but does not feel

hungry." *Id.*  She also reported pain symptoms for the first time, indicating that she first noticed

the symptoms after working in her garden.  *See id.*  She experienced the pain in her back, but

also, at least some of the time, in the left side of her face.  *See id.*  Borror advised Harris to

reduce her alcohol consumption and to change the time of day she took her Effexor.  *See* A.R.

331.

In a series of telephone calls and office visits in early June 2002, Harris reported to

Borror that her problems at work were continuing, as were her nausea and "no energy"

symptoms.  *See id.*  Borror prescribed Lorazepam.  *See id.*  Harris took one dose of the new

medication, fell asleep at work, and discontinued its use immediately thereafter.  *See* A.R. 332.

On June 17, 2002, Harris reported that her fatigue was still a problem, although

somewhat improved, and that she still felt decreased energy and loss of ambition.  *See id.*  She

also reported a high incidence in errors when dictating letters, and in choice of words when

speaking, which she attributed to Effexor.  *See id.*  Borror advised Harris to taper off the Effexor,

and to begin taking Zoloft instead.  *See id.*

Borror's prescribed treatments proved ineffective, and, in consequence of her fatigue

symptoms, Harris stopped working at McNees, Wallace & Nurick.  Her last full day of work was

Page 5 - FINDINGS AND RECOMMENDATION

June 28, 2002, *see* A.R. 199, although her employment (and therefore her coverage under the Policy) did not terminate until July 31, 2002, *see* A.R. 105. Pursuant to the Policy, Harris is therefore entitled to LTD benefits if she became disabled from her occupation as an attorney on any date from June 28 to July 31, 2002, and thereafter remained continuously disabled for a period of 180 days.

In August 2002 Borror consulted with internist John Nipple, seeking an alternative medical opinion as to the nature of her condition. *See* A.R. 332-333. Dr. Nipple conducted extensive laboratory tests on Harris, all of which produced results within the normal range, other than a low level of vitamin B12. *See id.* Nipple prescribed monthly B12 shots. *See id.*

On September 26, 2002, Harris reported to Borror that she felt significantly better since leaving work, but that she still had problems with tiring easily. *See* A.R. 333. Moreover, although she felt better, she reported spending two days in bed following a visit to her former workplace to retrieve personal belongings. *See id.* Borror concluded that Harris was suffering residual depression, although she noted that Harris' condition and affect were markedly improved over her most recent previous office visit. *See id.*

On November 5, 2002, in the course of a scheduled appointment to monitor the efficacy of Harris' depression treatment, Harris reported to Borror that she was "100% better, [and that she] fe[lt] better than she ha[d] felt in years." *See* A.R. 335. She reported that she "enjoy[ed] being off, taking care of home, re-acquainting herself w[ith her] sisters and mother and spending time w[ith] them." *Id.* In addition, Harris "found improvement in all areas of life incl[uding] mood, sleep, libido, etc." *Id.* Borror concluded that Harris' "[a]djustment disorder, depressed mood, [were] much better since leaving job[;] I think she made big turnaround." *Id.*

Page 6 - FINDINGS AND RECOMMENDATION

On December 18, 2002, Harris requested that Borror fax all of her medical records to Dr. Jacob Teitelbaum, a specialist in chronic fatigue syndrome. *See* A.R. 334. Harris met with Dr. Teitelbaum on December 23, 2002. *See* A.R. 275. At the conclusion of that meeting, Teitelbaum made a primary diagnosis of myofascial pain syndrome, and a secondary diagnosis of chronic fatigue syndrome, as well as hypothalamic dysfunction with accompanying neuro-endocrine immune dysfunction, and noted symptoms of severe insomnia, widespread severe pain, cognitive dysfunction, and severe fatigue and exhaustion, among others. *See* A.R. 196. Teitelbaum concluded that Harris was "100% disabled." A.R. 459.

On January 25, 2003, Harris applied for LTD benefits. *See* A.R. 197. Her application described her illness as "Cronic [*sic*] Fatigue and Immune Dysfunction Syndrome / Fibromyalgia[3]" and her symptoms as "Fatigue and Cronic [*sic*] Pain, Reduced Ability to Concentrate." *See* A.R. 199. The application did not reference any additional disabling condition or symptoms. *See id.* Standard referred Harris' application to consulting rheumatologist Shirley Ingram.

In a report dated April 8, 2003, Dr. Ingram opined that as of November 5, 2002, Harris could reasonably have returned to work as an attorney, based on Harris' self-report of her condition at that time. *See* A.R. 347. In addition, Ingram opined that Harris' medical records supported Borror's diagnosis of depression rather than Teitelbaum's diagnosis of chronic fatigue syndrome, based in part on Harris' reported symptoms and her responsiveness to depression treatment, and in part on what she concluded were flaws in Teitelbaum's diagnostic methods,

---

[3] As noted above, Teitelbaum diagnosed myofascial pain syndrome rather than fibromyalgia. Indeed, Teitelbaum specifically rejected a fibromyalgia diagnosis, noting that Harris did not have symptoms necessary to support such a diagnosis.

Page 7 - FINDINGS AND RECOMMENDATION

including Teitelbaum's failure to rule out depression as a cause of Harris' symptoms.  *See id.*
Ingram also noted that Teitelbaum never diagnosed Harris with fibromyalgia, and further noted
the absence of significant pain symptoms recorded in Harris' medical records other than one
instance reported as related to gardening.  *See id.*  Ingram also opined that Teitelbaum's plan to
follow up with Harris for the first time in May 2003, five months following his single meeting
with her, was inconsistent with the nature of his diagnosis.  *See id.*  Ingram recommended that
Standard obtain psychiatric or neurocognitive testing records if any such testing had been
performed.  *See id.*

Subsequently, by letter dated April 25, 2003, Standard denied Harris' application for
benefits.  *See* A.R. 362-355.  Standard's letter set forth each of Ingram's conclusions and
concerns, but did not specifically request that Harris provide psychiatric or neurocognitive
testing records if such testing had been performed.  *See id.*  Instead, Standard advised Harris that
she had 180 days within which to request review of its decision, and that she could include
additional material along with any such request.  *See* A.R. 356.  Standard's letter specified that
such additional information could helpfully include "medical records or chart notes indicating
that your medical condition is more severe than we previously understood and continues [*sic*] to
support your inability to perform the material duties of your own occupation throughout the 180
day benefit waiting period."  *Id.*  The letter specified that Standard's review would be conducted
by claims specialists not involved in the initial decision to deny benefits.  *See id.*

On July 21, 2003, by a letter drafted and signed by her husband, Harris appealed
Standard's decision.  *See* A.R. 463-461.  With her appeal, Harris included a letter from
Teitelbaum reiterating his prior diagnosis, and new medical files from Drs. Shashikant B. Patel

Page 8 - FINDINGS AND RECOMMENDATION

and Nita Rastogi.  Dr. Patel had seen Harris on February 27, 2003, in connection with "mild

macrocytic anemia," for which he recommended that Harris abstain from alcohol.  *See* A.R. 412-

409.  Patel noted that Harris had been diagnosed with chronic fatigue syndrome with onset in

October 2001, but did not independently arrive at this diagnosis.  *See id.*  By contrast, Dr.

Rastogi appears to have independently assessed Harris' reported symptoms as consistent with

chronic fatigue syndrome, hemochromatosis, and fibromyalgia as of March 25, 2003, although

her own testing did not uncover any data in support of such a diagnosis.  *See* A.R. 404.

Apparently because the letter requesting review suggested Standard's bad faith or

procedural irregularity in reaching its initial decision, the new information offered by Harris was

first considered by the same claims specialist and consulting physician who had first decided to

deny Harris' application.  They concluded that nothing in the new information changed their

initial evaluation, and therefore forwarded the entire file to Standard's "Quality Assurance Unit"

for independent review, advising Harris they were so doing by letter dated September 24, 2005.

*See* A.R. 505-499.

Standard's letter of September 2005 reiterated that Teitelbaum's medical records did not

support a diagnosis of fibromyalgia, and further asserted that Teitelbaum's methodology was at

odds with standard rheumatologic evaluation and unsupported by standard scientific reasoning,

and that his treatment regimen was not generally accepted within the medical community.  *See*

A.R. 501, 500.  Standard asserted, moreover, that even if a diagnosis of any pain syndrome were

well supported by the available medical records, such a diagnosis would not ordinarily disable

someone from a sedentary to light-level occupation.  *See* A.R. 500.  The letter additionally

reiterated that chronic fatigue syndrome is a diagnosis of exclusion, and therefore an untenable

Page 9 - FINDINGS AND RECOMMENDATION

diagnosis in the presence of indicators of depression.  *See* A.R. 501.  The September letter,

unlike the April letter, also expressly noted the absence of any neuropsychiatric evaluations or

other documentation of cognitive impairment in any of the records submitted by Harris.  *See*

A.R. 500.

       A new claims specialist reviewed the file on appeal, in consultation with internist Bradley

Fancher.  In a report dated October 2, 2003, Dr. Fancher reviewed Harris' medical history and

issued a conclusion consistent with that previously reached by Ingram.  *See* A.R. 533-528.

Fancher opined that Teitelbaum's treatment regimen was "without any scientific merit," labeled

him "unorthodox," and criticized his failures to document any review of Harris' medical records,

to perform a mental health history or examination, to perform cognitive testing, or to document

any cognitive dysfunction.  A.R. 531.  Fancher cited "numerous and easy to identify"

methodological flaws in Teitelbaum's publications, and opined that they would not have been

published in orthodox peer-reviewed medical journals.  A.R. 530.  Fancher also noted that Patel

and Rastogi's respective physical examinations of Harris were "unremarkable."  *Id.*  Fancher

opined that Harris' medical records supported a diagnosis of adjustment disorder associated with

depression, and that her condition would not have been disabling continuously through the

applicable benefits waiting period.  *See* A.R. 529.  In support of this opinion, Fancher found

Borror's chart note of November 5, 2002, "remarkable."  *Id.*

       On October 23, 2003, Standard advised Harris by letter of its final decision to deny her

application.  *See* A.R. 563-553.  The October letter explained the reasons for Standard's

conclusion that Harris did not have fibromyalgia, and further explained that fibromyalgia and

other pain syndromes do not disable a person from performing sedentary to light-level

occupations such as that of attorney. *See* A.R. 561-560. The letter also explained that a

diagnosis of depression or of adjustment disorder, which could account for fatigue symptoms,

precluded a diagnosis of chronic fatigue syndrome, and concluded that, in light of Borror's

November 5, 2002, chart note documenting Harris' self-report of improvement, her fatigue

symptoms had not been continuously disabling throughout the benefits waiting period.[4] *See* A.R.

558-557.

In its October letter, Standard advised Harris of her right to receive copies of documents

in her claim file without charge, and of her right to file suit against Standard in the event she

disagreed with its decision. *See* A.R. 554. This action followed.

## ANALYSIS

**I.**    **Applicable Standard of Review**

This court reviews an ERISA plan's denial of ERISA benefits *de novo*, except where the

administrator properly exercises discretionary authority to interpret plan terms and to make final

benefits determinations, in which case the denial is reviewed for abuse of discretion only:

> [A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a
> *de novo* standard unless the benefit plan gives the administrator or fiduciary
> discretionary authority to determine eligibility for benefits or to construe the
> terms of the plan [in which case the abuse of discretion standard applies]. . . .
> Thus, for purposes of actions under § 1132(a)(1)(B), the *de novo* standard of
> review applies regardless of whether the plan at issue is funded or unfunded and
> regardless of whether the administrator or fiduciary is operating under a possible
> or actual conflict of interest.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (citation, internal quotation

---

[4] The October letter further opined that, if Teitelbaum's opinion that Harris was "100%
disabled" due to pain and fatigue as of December 23, 2002, was correct, that such disability was
not due to the same cause as the adjustment disorder/depression that caused Harris to cease work
in June 2002, and that therefore the temporary recovery provision of the Policy was inapplicable.

marks and modifications omitted).

The Policy at issue here provides that:

> Except for those functions which the Group Policy specifically reserves to the Policy owner or Employer, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

A.R. 076.  Under applicable Ninth Circuit jurisprudence, this language is effective to confer

discretion on a plan administrator.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 (9th.

Cir. 1999); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963-964 (9th Cir. 2006)

(*en banc*).  However, before concluding that abuse of discretion is the appropriate standard of

review, this court must first consider the nature and impact of Standard's procedural

irregularities, if any.  In addition, if abuse of discretion is the appropriate standard, this court

must determine the appropriate level of skepticism to apply in light of any conflict of interest

applicable to Standard.

For the following reasons, this court concludes that Standard committed no procedural

errors in processing Harris' claim, and thus that its decision to deny Harris benefits may be

reviewed for abuse of discretion only.  The court further concludes that, in light of Standard's

structural conflict of interest, its benefits decision must be viewed with a cognizable but low

level of skepticism.

### A.    Procedural Irregularities

Even where a plan confers discretion on a plan administrator, when the administrator

commits "wholesale and flagrant" procedural violations in connection with a denial of benefits,

the courts apply a *de novo* standard in reviewing the administrator's decision:

**When an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review *de novo* the administrator's decision to deny benefits.**  We do so because, under *Firestone*, a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract.  489 U.S. at 111. *Firestone* directs, consistent with trust law principles, that "a deferential standard of review [is] appropriate when a trustee *exercises* discretionary powers." *Id.* (emphasis added).  Because an administrator cannot contract around the procedural requirements of ERISA, decisions taken in wholesale violation of ERISA procedures do not fall within an administrator's discretionary authority.

In general, we review *de novo* a claim for benefits when an administrator fails to exercise discretion.

*Abatie*, 458 F.3d at 972 (bolded emphasis supplied, modifications original).

Procedural violations that are less than "wholesale and flagrant," by contrast, do not trigger *de novo* review.  Nevertheless, such irregularities constitute a factor in determining whether a plan administrator abused its discretion:

As noted, a procedural irregularity in processing an ERISA claim does not usually justify *de novo* review.  That generalization does not mean, however, that procedural irregularities are irrelevant to the court's analysis.

A procedural irregularity. . . is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion.  When an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity.  A more serious procedural irregularity may weigh more heavily.

*Abatie*, 458 F.3d at 972 (citations, internal quotation marks omitted).

Moreover, where such irregularities prevent a claimant from fully developing the administrative record, the court must permit the claimant to present additional evidence that could have been submitted absent the procedural defalcation.  *See id.* at 972-973.  "In that way the court may, in essence, recreate what the administrative record would have been had the

procedure been correct." *Id.* at 973. In the event such newly submitted evidence is significant, as a practical matter *de novo* review will be required despite a plan's conferral of discretion, in that the administrator's decision will necessarily have been made without the benefit of all relevant evidence. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 2008 U.S. App. LEXIS 334, 24-25 (9th Cir. 2008).

Here, Harris argues that in processing her claim Standard committed wholesale and flagrant procedural errors justifying *de novo* review; in the alternative, Harris argues that the alleged errors prevented full development of the record, opening the door to submission of significant extra-record evidence, similarly requiring *de novo* review. For their part, defendants argue that Standard committed no procedural errors, neither wholesale and flagrant nor otherwise.

For the following reasons, this court finds that defendants are correct: Standard complied with the procedural requirements established by Congress for ERISA plan administrators in connection with the denial of benefits, and therefore committed no procedural irregularity.

### 1.    29 C.F.R. 2560.503-1(j)(3)

Harris' first assignment of error is that Standard violated a notification requirement under 29 C.F.R. 2560.503-1(j)(3). Harris argues, specifically, that she did not receive the required notification until after Standard had already denied her claim and it was too late for her to develop the administrative record further.

ERISA plans are required to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and

the adverse benefit determination."  29 C.F.R. 2560.503-1(h)(1).  Following such review, plans

are required to provide claimants with written or electronic notification of the plan's review

determination.  *See* 29 C.F.R. 2560.503-1(j).  Such notification must "set forth, in a manner

calculated to be understood by the claimant," among other things,  "[a] statement that a claimant

is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all

documents, records, and other information relevant to the claimant's claim for benefits."  29

C.F.R. 2560.503-1(j)(3).

Harris concedes that Standard's letter of October 23, 2003, contained a compliant

notification statement following Standard's review on appeal of its decision to deny benefits.

However, Harris argues that Standard's letter of September 24, 2003, which did not contain such

a statement, also constituted a notification of the Plan's review determination, and that the failure

to advise Harris of her right to a copy of the administrative record in that letter was in violation

of Section 503-1(j)(3).

Harris' argument is unpersuasive.  Standard's September 2003 letter followed

consideration  by the same claims specialist who made the initial benefits determination of new

evidence Harris submitted in connection with her request for review, but expressly preceded the

review procedure required by the Code of Federal Regulations.  Because the September letter did

not follow the "full and fair review" of the adverse benefits determination by "an appropriate

named fiduciary of the plan" provided for in Section 503-1(h)(1), it did not trigger the

requirements of Section 503-1(j).  Standard was not required to issue the Section 503-1(j)(3)

notification statement in *advance* of the statutorily prescribed review, and therefore did not

violate its procedural requirements by failing to do so.

Page 15 - FINDINGS AND RECOMMENDATION

### 2.    29 C.F.R. 2560.503-1(g)

Harris' second assignment of error is that Standard's first two letters, respectively dated April 25 and September 24, 2003, failed to identify adequately the additional materials and information that Harris would have needed to submit in order to prove her entitlement to benefits.  Specifically, Harris points to Standard's failure in its April 2003 letter to flag the absence of psychiatric or neurocognitive testing records from Harris' submitted materials and the alleged vagueness of Standard's description of additional materials that could be helpfully submitted.

ERISA plan administrators are required pursuant to 29 C.F.R. 2560.503-1(g) to provide claimants with "written or electronic notification of any adverse benefit determination."  29 C.F.R. 2560.503-1(g)(1).  Such notifications must "set forth, in a manner calculated to be understood by the claimant," among other things, "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."  *Id.*  This mandate must be read in light of the holding in *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997), that "what this regulation[5] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries."  *Booton*, 110 F.3d at 1463.  The *Booton* court illustrated its point with the plain-English injunction that "if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it."  *Id.*

More recently, in *Saffon*, *supra*, the Ninth Circuit provided additional guidance as to how

_____

    [5]  The *Booton* holding addressed a substantially identical predecessor regulation to Section 503-1(g).

a plan administrator should conduct the "meaningful dialogue" required by Section 503-1(g).

*Saffon*, 2008 U.S. App. LEXIS 334 at 14.  The *Saffon* court decried the obfuscatory language of

the plan administrator's communications with its beneficiary, which was in crucial places both

semantically empty and syntactically unparsable.   The court further  took the plan administrator

to task for failing to explain why the claimant's medical records did not support a finding of

disability, for noting the absence of critical diagnostic testing only in its final communication

with the claimant, for patently illogical medical reasoning, for apparently willful

misinterpretation of the available medical evidence, and for communicating with the claimant's

treating physicians (and setting arbitrary deadlines for the physicians' responses) without the

claimant's knowledge or consent.  *See id.* at 14-20.

Here, Standard's communications with Harris, while occasionally agrammatical, were

nevertheless reasonably comprehensible.  In each of its letters, Standard was at pains to explain

in detail the basis for its disagreement with Teitelbaum's diagnosis.  Standard's letters indicate

that Harris' medical records were reviewed thoroughly, and without distortion of the evidence

they contained.  Standard did not attempt to contact Harris' treating physicians without her

knowledge.

It is troubling, however, that Standard did not act on Ingram's recommendation to obtain

records of any psychiatric or neurocognitive tests, if any such testing had been performed, in its

April 2003 letter.  As Harris argues, had she been made aware in advance of requesting review

that psychiatric or neurocognitive testing might have uncovered evidence in support of her claim,

she might have obtained such testing before Standard's final benefits denial issued.

Nevertheless, Standard's failure to specifically advise Harris that psychiatric or neurocognitive

testing could potentially bolster her claim does not amount to a procedural violation.

First, Standard was not required to provide an exhaustive list of every possible piece of medical evidence that could conceivably strengthen Harris' application; rather, the regulations required Standard to advise Harris of what additional information it needed to intelligently evaluate Harris' claim.  That Standard stated that "[a]dditional information, which would be helpful to a reconsideration of your claim, includes medical records or chart notes indicating that your medical condition is more severe than we previously understood and continues [*sic*] to support your inability to perform the material duties of your own occupation throughout the 180 day benefit waiting period" in *general* terms does not render its statement impermissibly *vague*. Indeed, increased specificity would likely have been misleading, in that the absence of psychiatric or neurocognitive testing was not ultimately critical to Standard's decision.  Had Harris been specifically advised that such testing might strengthen her application, she might have focused her efforts on obtaining those tests to the exclusion of other medical information of comparable or greater importance.  Instead, Standard requested in plain English the additional information that was needed:  *any* medical records tending to support the conclusion that her medical condition was more severe than indicated by the evidence already available.

Second, unlike the plan administrator in *Saffon*, Standard did advise Harris that some degree of weight was being placed on the absence of evidence of cognitive dysfunction in her available medical records in advance of the final benefits decision.  Harris was put on notice of the absence of such evidence by Standard's letter of September 2003, which preceded Standard's statutorily mandated "full and fair review" of her claim.  Unlike the *Saffon* plaintiff, Harris therefore had an opportunity, of which she did not avail herself, to further supplement and

develop the administrative record before the final benefits decision was made.

Third and finally, as noted above, the absence of evidence of cognitive deficits was merely one datum among many noted by Standard's physician consultants. More critical to both the initial decision and the decision on review were the facts that pain syndromes are not considered disabling with respect to sedentary or light-level occupations and that Harris appeared to be free of fatigue symptoms before the end of the 180-day benefits waiting period. Neither Standard's letters nor the reports of the consulting physicians suggest that psychiatric or neurocognitive testing might have significantly modified the conclusions Standard drew from these facts.

Because Standard's letters to Harris were compliant with 29 C.F.R. 2560.503-1(g), defendants committed no procedural irregularity in their description of additional information that might helpfully have been submitted in connection with Harris' request for review.

### 3.      Misleading Reference

Harris suggests that Standard may have committed procedural errors by misleadingly referring to the Policy definition of disability from *any* occupation in its letter to Harris dated April 25, 2003. In fact, although the letter did quote in full the Policy definition of disability, including disability from any occupation, the letter clearly specified that to be entitled to benefits Harris needed only to meet the definition of disability from her *own* occupation, and thereafter referred specifically to "own occupation" disability only. It was therefore neither procedurally irregular nor misleading to quote the disability definition in full.

### B.      Conflict of Interest

It is well settled that "if a benefit plan gives discretion to an administrator or fiduciary

who is operating under a conflict of interest, that conflict must be weighed as a factor in

determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115.  That is,

*Firestone* requires "abuse of discretion review whenever an ERISA plan grants discretion to the

plan administrator, but a review informed by the nature, extent, and effect on the

decision-making process of any conflict of interest that may appear in the record." *Abatie*, 458

F.3d at 967.  "This standard applies to the kind of inherent conflict that exists when a plan

administrator both administers the plan and funds it, as well as to other forms of conflict." *Id.*

Under *Abatie*, the courts of the Ninth Circuit applying the abuse of discretion standard to denials

of ERISA benefits review conflict of interest allegations on a case by case basis, applying a level

of skepticism appropriate to the egregiousness of the particular conflict of interest and of the

indicia that it may have tainted the administrator's decision.  *See Abatie*, 458 F.3d at 968-969.

Specifically, the *Abatie* court held that:

> The level of skepticism with which a court views a conflicted administrator's
> decision may be low if a structural conflict of interest is unaccompanied, for
> example, by any evidence of malice, of self-dealing, or of a parsimonious
> claims-granting  history.  A court may weigh a conflict more heavily if, for
> example, the administrator provides inconsistent reasons for denial, fails
> adequately to investigate a claim or ask the plaintiff for necessary evidence, fails
> to credit a claimant's reliable evidence, or has repeatedly denied benefits to
> deserving participants by interpreting plan terms incorrectly or by making
> decisions against the weight of evidence in the record.

*Id.* (citations omitted).

Here, all parties agree that Standard operates under a structural conflict of interest, in that

it both decides whether or not claimants will receive benefits and is the party responsible for

paying benefits when they are awarded.  Such a conflict of interest necessarily creates a serious

risk of biased decisionmaking by plan administrators, and is not to be treated lightly even absent

Page 20 - FINDINGS AND RECOMMENDATION

additional aggravating factors.

In connection with Standard's conflict of interest, Harris offers evidence that Standard assigned claims filed by claimants with predisability monthly earnings in excess of $10,000 (such as Harris) to a special unit, known as the "C team," for processing, evidence that the physician who consulted with Standard in connection with its review of Harris' claim on appeal was compensated at $130 per hour for his work with Standard, and evidence that, at the time Harris' claim was processed, Standard had a bonus system in place whereby Standard's employees could become entitled to money bonuses under circumstances unspecified in either the offered evidence or the parties' briefing.  Harris does not, however, offer evidence of Standard's malice, self-dealing, history of denying meritorious claims, or history of misinterpreting policy terms or disregarding medical evidence, nor does she offer evidence that the "C team" employed any different standard in processing claims than Standard's other employees used in processing claims of lesser monetary value.  Moreover, the evidence in the record does not support any conclusion that Standard gave inconsistent reasons for its denial of Harris' claim, that it failed to investigate her claim or to ask her for necessary evidence, or that it failed to credit competent medical evidence in the record.

In light of the evidence before the court, including evidence outside the administrative record submitted for the express purpose of demonstrating the extent of Standard's conflicted decisionmaking, Standard's conflict of interest merits only a "low" level of skepticism.  *See Abatie*, 458 F.3d at 967, 968-969.

## II.    Motion to Strike

As noted above, Harris argues that Standard's alleged procedural irregularities prevented

Page 21 - FINDINGS AND RECOMMENDATION

her from fully developing the administrative record and that, under *Abatie*, she is therefore

entitled to supplement the record to the same extent that the alleged defalcations prevented its

full development.  On this basis, Harris now offers the following extra-record documents:  a

neuropsychological examination and evaluation prepared by Dr. Curt Sandman in September

2007, and the declarations of Harris, of her husband, and of Teitelbaum.  Defendants move to

strike these documents, on the ground that this court may not consider evidence outside the

record in reviewing the merits of Standard's benefits decision.  For the following reasons, this

court agrees with defendants, and grants the motion to strike.

On *de novo* review of an ERISA plan's denial of benefits, the district courts have

discretion to consider any evidence offered by the parties, but under an abuse of discretion

standard, the courts are generally limited to review of the administrative record.  *See*, *e.g.*, *Jebian*

*v. Hewlett-Packard Co. Emple. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir.

2003).  One exception to this general rule arises where a plan administrator operates under a

conflict of interest.  Under that circumstance, the courts may consider evidence outside the

record in connection with establishing the extent an administrator's conflict of interest *only*

(review of the merits of the administrator's decision must still rest wholly on evidence within the

administrative record, even where a conflict of interest is established):

> The district court may, in its discretion, consider evidence outside the
> administrative record to decide the nature, extent, and effect on the
> decision-making process of any conflict of interest; the decision on the merits,
> though, must rest on the administrative record once the conflict (if any) has been
> established, by extrinsic evidence or otherwise.

*Abatie*, 458 F.3d at 970.  The evidence that Harris now offers goes strictly to the merits of

Standard's benefits decision rather than to establishing conflict of interest, and therefore cannot

be admitted pursuant to *Abatie*'s conflict of interest exception.

As noted above, however, where a plan has committed procedural irregularities the courts may consider evidence outside the administrative record to supplement gaps in the record caused by the procedural defalcations. *See Abatie*, 458 F.3d at 972-973. In this case, for reasons set forth above, the court has concluded that Standard complied with all applicable procedural requirements. Harris therefore may not offer extra-record evidence pursuant to *Abatie*'s procedural irregularity exception. This court's review must necessarily be limited to the administrative record, and the extra-record materials submitted by Harris are properly stricken from the record.

## III.    The Parties' Cross-Motions for Summary Judgment

As noted above, Harris' complaint articulates three claims, styled as claims for recovery of benefits, for breach of fiduciary duty, and for equitable relief; properly speaking, the third "claim" is a request for relief premised on defendants' liability for at least one of the other two claims. Now before the court are the parties' cross-motions styled as motions for summary judgment, each of which expressly addresses the merits of the recovery of benefits claim and fails to address either of the other two claims raised in Harris' complaint. Because Harris' counsel conceded at oral argument that his client's breach of fiduciary duty claim would not be viable in the event the recovery of benefits claim was dismissed, this court will treat defendants' motion as a motion for summary judgment as to all of Harris' claims, and Harris' motion as a motion for partial summary judgment as to the recovery of benefits claim only.

Also as noted above, this court's review, to be conducted with all due skepticism in light of Standard's structural conflict of interest, is for abuse of discretion only. "An abuse of

discretion is found only when there is a definite conviction  that the [decisionmaker] made a clear error of judgment in its conclusion upon weighing relevant factors." *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 452 (9th Cir. 1980); *see also Oster v. Barco of Cal. Employees' Retirement Plan*, 869 F.2d 1215, 1218 (9th Cir. 1988) (no abuse of discretion by an ERISA administrator unless the decision is "so patently arbitrary and unreasonable as to lack foundation in factual basis").

Here, Standard's decision to deny benefits was neither clearly in error nor unreasonable, was based on review of all available evidence, and was substantially supported by evidence in the record.  Specifically, Standard could reasonably have concluded, based on Harris' self-report of significant improvement and Borror's medical opinion that Harris' adjustment disorder had undergone a "big turnaround" in November 2002, that Harris' fatigue symptoms had improved to the point that she was no longer disabled from her occupation before the end of the benefits waiting period.  Standard could reasonably have further concluded, based on evidence in the record, that Harris' pain symptoms were not sufficiently severe to be disabling with regard to employment as an attorney.  Moreover, reasonable medical professionals could disagree as to the accuracy of Teitelbaum's diagnoses and conclusion that Harris was disabled by myofascial pain syndrome and chronic fatigue syndrome, as evidenced by the fact that Borror, Harris' treating physician of many years, did not share in them.

In addition, although this court views the reports drafted by Ingram and Fancher with all due skepticism, Standard's consulting physicians opined persuasively that Teitelbaum's methodologies, diagnoses, and treatment regimens were flawed and untrustworthy.  Even viewing Standard's exercise of discretion as skeptically as permitted by applicable law, this court

cannot conclude that Standard abused its discretion by concluding that Teitelbaum's conclusions

were inaccurate. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("courts

have no warrant to require administrators automatically to accord special weight to the opinions

of a claimant's physician; nor may courts impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation"); *see also id.* at 832 ("the assumption that the opinions of a treating physician

warrant greater credit than the opinions of plan consultants may make scant sense when, for

example, the relationship between the claimant and the treating physician has been of short

duration. . . .  And if a consultant engaged by a plan may have an 'incentive' to make a finding of

'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled').

The existence of evidence in the record that would have supported a contrary conclusion

is not evidence of abuse of discretion.  *See*, *e.g.*, *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d

1469, 1473-1474 (9th Cir. 1993) ("In the ERISA context, even decisions directly contrary to

evidence in the record do not necessarily amount to an abuse of discretion"); *Bolling v. Eli Lilly

& Co.*, 990 F.2d 1028, 1029-30 (8th Cir. 1993) ("The [administrator] did not abuse its discretion

merely because there was evidence before it that would have supported an opposite decision"),

*cited with approval by Taft*, 9 F.3d at 1474; *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967

F.2d 377, 382 (10th Cir. 1992) (determination that claimant was not disabled was supported by

"substantial evidence" and the administrator's decision was therefore not an abuse of discretion

where one doctor's report concluded the claimant was disabled and the other did not), *cited with

approval by Taft*, 9 F.3d at 1474; *see also Anderson v. Operative Plasterers' & Cement Masons'

Int'l Ass'n*, 991 F.2d 356, 358-59 (7th Cir. 1993) (not abuse of discretion to deny benefits despite

Page 25 - FINDINGS AND RECOMMENDATION

previous finding of disability by social security board), *cited with approval by Taft*, 9 F.3d at 1474. Because there was a factual basis in the record to support Standard's decision, and because Standard's decision was reasonable in light of that factual basis, this court must conclude that Standard did not abuse its discretion in denying benefits to Harris.

Because Standard was within its discretion to deny Harris' application for LTD benefits, her recovery of benefits claim necessarily fails. Harris' motion for partial summary judgment should therefore be denied in its entirety. Because Harris has conceded through her counsel that her remaining claims are nonviable in the event her recovery for benefits claim is dismissed, defendants' motion for summary judgment should be granted as to all of Harris' claims.

## CONCLUSION

For the reasons set forth above, this court grants defendants' motion to strike (#62), recommends that Harris' motion for summary judgment (#55) be denied, and recommends that defendants' motion for summary judgment (#44) be granted as to each of Harris' claims. A judgment should be prepared dismissing Harris' claims with prejudice.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due February 11, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If

objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 28th day of January, 2008.

 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge